**STATE of North Dakota, Plaintiff and Appellant,**

v.

**Richard Allen RINGQUIST, Defendant and Appellee.**

**Cr. Nos. 870361, 870362.**

Supreme Court of North Dakota.

Dec. 6, 1988.

Owen K. Mehrer (argued), States Atty., Dickinson, for plaintiff and appellant.

Freed, Dynes, Reichert & Buresh, P.C., Dickinson, for defendant and appellee; argued by Eugene F. Buresh.

GIERKE, Justice.

This is an appeal by the State of North Dakota from a district court order suppressing evidence obtained during a search of Richard Allen Ringquist's apartment pursuant to a search warrant issued by the Stark County Court. We reverse and remand.

The evidence presented to the county court to obtain the search warrant consisted of the testimony of two Dickinson police officers, Chuck Rummel and Darrel Haag. Rummel testified that at about 5:30 a.m. on July 27, 1987, he received an anonymous telephone call from an informant who furnished information relating to drug traffic on the previous night at apartment number 5 above D.J.'s Bar at 1 East Villard in Dickinson. The anonymous informant declined to reveal his identity and indicated that he had never made a report to the police before but that he was doing so now because of the large amount of marijuana involved and "something should be done with it."

Officer Rummel testified that the anonymous informant indicated that on the previous afternoon friends of his had told him that if he wanted to buy some marijuana he should go to apartment number 5 at 1 East Villard and see "Little Richard"; that at about 8:30 p.m. that evening he and some friends went to apartment number 5 and purchased some marijuana; that while he was at apartment number 5, he went into a back bedroom that faced south on Villard and saw about six pounds of what he recognized as marijuana covered with a plastic sheet on a table by the bedroom door; that he observed the occupants of the apartment weighing the marijuana on a scale and selling it for between $40 and $45 a quarter ounce; that while he was in the living room, several people walked in and out of the apartment and went to the back bedroom; that "Little Richard" was a "shorter, older man" who drove a green 1966 to 1968 Ford Galaxie two-door that was usually parked in front of D.J.'s; and that Bob Kitchen also lived at apartment number 5.

Officer Haag testified that, based on the information supplied by the anonymous informant, he conducted an independent investigation and confirmed that a cable television outlet registered to Richard Ringquist had recently been disconnected at apartment number 5. Haag also contacted the North Dakota Motor Vehicle Department and confirmed that a green 1968 Ford two-door car parked near the apart-

ment building with license number ASP 505 was registered to "Richard A. Ringquist, Box 1495, Dickinson," and that Ringquist's description with the Motor Vehicle Department listed him as being five-foot-four-inches tall, 140 pounds, with birthdate of October 1, 1937. Haag also testified that Ringquist's apartment had been under surveillance on the afternoon of July 27, 1987, and that Ringquist was observed leaving the apartment and driving the green Ford two-door car with license number ASP 505. Haag testified that the surveillance team observed Ringquist and an unknown female go to the Spur Bar for a considerable amount of time and thereafter Ringquist and two other females left the Spur Bar and went to "East Mon–Dak" where one of the females made a phone call, after which they returned to the Spur Bar.

Haag also testified that he knew that Kitchen had pled guilty to possession of marijuana in 1981 and that from a previous check of Ringquist's record, Haag recalled that Ringquist had been arrested in California in the late 1960's or early 1970's "on delivery and/or possession charges … related to LSD and/or heroin."

Officer Haag also testified that on March 31, 1987, he had interviewed a confidential informant who indicated that Bob Kitchen usually sold cocaine and could normally be found at D.J.'s Bar, and that Ringquist was "very much into the selling of controlled substances … [and] prescription drugs, Percodan, Delauded and Valium." Haag further testified that the confidential informant contacted him in early July 1987 with information that Ringquist "was waiting for some dope to come in so that he could make considerable amount of money so that he could get out of Dickinson because he was concerned that the police department had already … what we call tap into them, as a seller of drugs." The informant also informed Officer Haag that Ringquist "drove approximately a 1967 Ford green two-door, with a white vinyl top … that … [was] normally always parked in front of D J's Bar on Sims—or on East Villard, or in the lot immediately to the east of the Burlington Northern Railroad." Haag testified that he considered this confidential informant reliable because he had previously supplied information enabling drug agents to purchase controlled substances from individuals in Dickinson, and he had been a prosecution witness in a case resulting in a conviction on a burglary and theft charge.

Officer Haag also testified that he received information on April 2, 1987, from a second confidential informant about Ringquist. According to the second confidential informant, Ringquist and another person had stopped him in the street on April 2, 1987, after an armed robbery at a Dickinson pharmacy which resulted in the theft of prescription drugs, including Percodan, Percost, Delauded, and Valium, and Ringquist told that informant that he wanted to track down the robbers because he "wanted some of the dope to sell. And to utilize themselves." Haag also testified that this informant told him that Ringquist had said that the robbers had been at a house on the south side prior to the robbery; a tip that the police subsequently confirmed with an occupant of the house. Haag also testified that the robbers had given statements to South Dakota police in which they admitted robbing the Dickinson pharmacy and that Stark County was in the process of extraditing them.

Based on the testimony of Rummel and Haag, the county court determined that, under the totality of the circumstances, there was probable cause to issue a search warrant for the search of apartment number 5 for marijuana, paraphernalia or other evidence pertaining to the possession, purchase, or sale of marijuana, and the court issued a search warrant.

During the search, law enforcement officers seized cocaine and marijuana, and Ringquist was charged with one count of possession of marijuana and one count of possession of cocaine. The cases were consolidated, and Ringquist moved to suppress the evidence obtained during the search upon the grounds that the evidence presented to the county court to support the issuance of the search warrant was insufficient to establish probable cause under the Fourth and Fourteenth Amend-

ments of the United States Constitution and Article I, Section 8 of the North Dakota Constitution.[1]

The district court granted Ringquist's motion to suppress the evidence, stating that the only evidence corroborated by the police was Ringquist's residence, ownership of the 1968 car, and general physical characteristics. The district court stated the "information of two additional confidential informants, one furnished in February, 1987 and the other in March, 1987, [were] ... conclusory statements that the Defendant was 'selling drugs' ... [and] that Detective Haag 'believed each confidential informant to be reliable'." The district court observed that the "offering of stale informational conclusions furnished by confidential informants adds nothing in the attempted corroboration" and concluded

> "[t]hat under the Aguilar two-pronged test, the information furnished to the magistrate was lacking in veracity. That under the Gates 'totality of circumstances' test, the magistrate was not furnished with a substantial basis for determining the existence of probable cause ...; [and that under the Leon good-faith exception to the exclusionary rule] the information furnished to the magistrate was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

The State contends that the search warrant was supported by probable cause under the two-prong test of *Aguilar v. State of Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed. 2d 637 (1969). Alternatively, the State argues that the evidence supporting the warrant established probable cause under the totality-of-circumstances test of *Illinois v.* *Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Finally the State argues that even if the search warrant was issued without probable cause, the good-faith exception to the exclusionary rule developed in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), should be applied.

Ringquist responds that we should not adopt *Gates* and *Leon* as a matter of state constitutional law and that the standard for determining probable cause for a search warrant under our state constitution is *Aguilar–Spinelli* which, he argues, has not been met. Alternatively Ringquist argues that even if we adopt *Gates* or *Leon* as a matter of state constitutional law, neither standard enunciated in those cases has been satisfied in this case.

In analyzing this issue, we briefly trace the United States Supreme Court decisions dealing with the sufficiency of information to establish probable cause for the issuance of a search warrant. Before *Aguilar*, the United States Supreme Court held that a search warrant could not be issued upon purely conclusory statements that probable cause existed. *Nathanson v. United States*, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933) [warrant based upon customs agent's statements that he had cause to suspect and believe that illegal liquor was at a certain location was invalid because it went upon a mere affirmation or suspicion and belief without any statement of adequate supporting facts]; *Giordenello v. United States*, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) [warrant based upon affidavit that contained no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein was invalid]. In *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 735, 4 L.Ed.2d

---

1. The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article I, § 8 of the North Dakota Constitution provides:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

697, 707 (1960), the United States Supreme Court permitted hearsay to serve as basis for a search warrant so long as substantial basis for crediting the hearsay was presented to the magistrate.

In *Aguilar, supra,* 378 U.S. at 114–115, 84 S.Ct. at 1514, the United States Supreme Court further refined how hearsay should be evaluated to assess probable cause with the following two-pronged test:

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see *Rugendorf v. United States,* 376 U.S. 528, 84 S.Ct. 825 [11 L.Ed.2d 887], was 'credible' or his information 'reliable.' Otherwise, 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime,' *Giordenello v. United States,* supra, 357 U.S. at 486, 78 S.Ct. at 1250; *Johnson v. United States,* supra, 333 U.S. [10] at 14, 68 S.Ct. [367] at 369 [92 L.Ed. 436], or, as in this case, by an unidentified informant."

That two-pronged test requires that before a warrant may be issued the magistrate must be informed of enough underlying circumstances to enable him to determine that the informant's observations regarding the commission of the crime were accurate (basis of knowledge prong) and that the informant was credible or his information was reliable (veracity prong). *Aguilar, supra.*

In *Spinelli, supra,* the United States Supreme Court suggested that deficiencies in either prong could be satisfied by police corroboration. According to *Spinelli, supra,* the veracity prong could be satisfied by establishing the informant's inherent credibility or by establishing that the information was reliable. If the veracity prong was not satisfied by those means the information given to establish veracity could be buttressed by independent police investigation, because the corroboration of part of an informant's information lends credence to the remaining unverified information.

According to *Spinelli, supra,* the basis-of-knowledge prong could be satisfied by a showing that the informant provided so much detail as to indicate that he must be speaking from first-hand knowledge and not rumor:

"In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli, supra,* 89 S.Ct. at 589.

In *Gates, supra,* 462 U.S. 238–239, 103 S.Ct. 2332, the United States Supreme Court abandoned the two-pronged test of *Aguilar–Spinelli* for probable-cause analysis under the Fourth Amendment:

"In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations.... The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed."

The *Gates* majority stated that the veracity and basis of knowledge prongs of *Aguilar–Spinelli,* were each relevant in assessing an informant's tip, but that those two

prongs were not entirely separate and independent requirements intended to be rigidly compartmentalized. According to *Gates* a deficiency in either prong could be compensated for in determining the reliability of a tip by a strong showing as to the other prong, or some other indicia of reliability. *Gates* encouraged courts to continue to rely upon the elaboration of the two prongs not as separate and independent requirements to be rigidly applied in every case, but as "closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Gates, supra,* 462 U.S. at 230, 103 S.Ct. at 2328.

■ Our analysis under the Fourth Amendment is controlled by the totality-of-the-circumstances test announced in *Gates*. However, we have not heretofore decided whether we should chart an independent course under Article 1, § 8 of the North Dakota Constitution for assessing probable cause to issue a search warrant. *State v. Thompson,* 369 N.W.2d 363 (N.D.1985); *State v. Ronngren,* 361 N.W.2d 224 (N.D. 1985).

Although as a matter of state constitutional law we may provide the citizens of our state greater protection in interpreting our State Constitution than the safeguards guaranteed by a parallel provision of the Federal Constitution, *see State v. Thompson, supra; State v. Stockert,* 245 N.W.2d 266 (N.D.1976); *State v. Matthews,* 216 N.W.2d 90 (N.D.1974), we adopt the *Gates, supra,* totality-of-the-circumstances test for analyzing this type of search and seizure issue under Article 1, § 8, N.D. Const., and we hold that, in this case, there was probable cause to issue the search warrant under that standard.

We recognize that some other jurisdictions and legal scholars have criticized the rationale of *Gates*. *State v. Jones,* 706 P.2d 317 (Alaska 1985); *State v. Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985); *Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985); *State v. Jackson,* 102 Wash.2d 432, 688 P.2d 136 (1984); Kami-

sar, *Gates,* "Probable Cause", "Good Faith", And Beyond, 69 Iowa L.Rev. 551 (1984); 1 W. LaFave, Search and Seizure, § 3.3 (Supp.1984). However, we are persuaded that the flexibility provided by the *Gates* approach is more consistent with a practical, non-technical conception of probable cause. In so doing we join the majority of jurisdictions which have adopted *Gates* as a matter of state constitutional law. *E.g., People v. Pannebaker,* 714 P.2d 904 (Col.1986); *State v. Lang,* 105 Idaho 683, 672 P.2d 561 (1983); *Potts v. State of Maryland,* 300 Md. 567, 479 A.2d 1335 (1984); *State v. Novembrino,* 105 N.J. 95, 519 A.2d 820 (1987); *State v. Arrington,* 311 N.C. 633, 319 S.E.2d 254 (1984); *State v. Adkins,* 346 S.E.2d 762 (W.Va.1986); *Bonsness v. State,* 672 P.2d 1291 (Wyo.1983); *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1986). *See* Vol. 14, # 1, Search and Seizure Law Report, January 1987.

Particularly significant in our decision to adopt *Gates* is the interrelationship of the standard of proof necessary to establish probable cause with the flexibility of the totality of the circumstances test. Probable cause to search does not require the same standard of proof necessary to establish guilt at trial; rather, probable cause to search exists if it is established that certain identifiable objects are probably connected with criminal activity and are probably to be found at the present time at an identifiable place. *State v. Mondo,* 325 N.W.2d 201 (N.D.1982). We have said that:

  " 'Probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed.' "

*State v. Schmeets,* 278 N.W.2d 401, 406 (N.D.1979), *citing Berger v. State of New York,* 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967).

We agree with the *Gates* rationale that a "fluid" concept like probable cause turns on the assessment of probabilities under the particular factual circumstances of

each case and is not easily reduced to a rigid set of hypertechnical legal rules. We do not believe that excessive technical dissection of an informant's tips, with undue attention focused on isolated issues, can be sensibly separated from other facts presented to the magistrate in assessing whether there is probable cause to believe that certain identifiable objects are probably connected with criminal activity and are probably to be found at the present time at an identifiable place. We recognize that the guidelines provided by *Aguilar–Spinelli* have been, and still will be, helpful for an informed decision by a magistrate; however, we believe that the complex variables underlying the probable cause determination and the varying factual pattern regarding how the police obtain information that serves as the basis for a search warrant militates in favor of a flexible test for assessing probable cause without hypertechnical application of rigid rules.

■ Although we adopt the *Gates* test under our state constitution, we also caution, as the *Gates* court did, that there are limits beyond which a magistrate may not venture in issuing a search warrant. Sufficient information, rather than a "bare bones" affidavit, must still be presented to the magistrate to allow that official to determine probable cause. That determination cannot be a mere ratification of the bare conclusions of others. We also reiterate the observations we made in *State v. Thompson, supra,* 369 N.W.2d at 370, citing *United States v. Sorrells,* 714 F.2d 1522, 1528–29 (11th Cir.1983):

" 'The test in *Aguilar* has served many useful purposes aside from insuring that the constitutional rights of citizens be respected. It has given to law enforcement officers, prosecuting attorneys and the courts a straightforward test for resolving disputes over the issuance of a warrant. We do not view *Gates* as an endorsement of slovenly or careless law enforcement work. Such work will continue to produce problems for the prosecution, the defense and the courts engaged in a case by case analysis rather than a repair to certain and definite

rules. The Court in *Gates* stated that *Aguilar* has provided guidance in determining the existence of probable cause and it is not anticipated that departure from these guidelines will be looked upon with favor.' "

In this case the district court concluded that some of Officer Haag's testimony about information received from the two confidential informants was stale. In applying *Gates* we must initially assess the relationship of that information to the probable cause determination for the issuance of a search warrant.

■ It is a fundamental principle of search and seizure law that information furnished in an application for a search warrant must be timely and that probable cause to search must be found to exist at the time the search warrant is issued. *State v. Mondo,* 325 N.W.2d 201 (N.D. 1982); *see* W. LaFave, Search and Seizure § 3.7(a) (1987). An application for a warrant that is based upon stale information of previous misconduct is insufficient because it does not establish probable cause that similar or other improper conduct is continuing to occur. *E.g., United States v. Weinrich,* 586 F.2d 481 (5th Cir.1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979). The likelihood that the evidence sought is still in place depends on a number of variables including the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched. *E.g. United States v. Tehfe,* 722 F.2d 1114 (3rd Cir.1983), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984). Staleness is an issue which must be decided on the particular facts of each case and no mechanical test exists for determining the number of days after which information becomes stale. *Id.; United States v. Hyde,* 574 F.2d 856 (5th Cir.1978). In *Bastida v. Henderson,* 487 F.2d 860, 864 (5th Cir.1973), the Fifth Circuit laid out a basic rule for determining staleness:

"A number of the other Circuits have confronted situations similar to the one now before us. In general, the basic criterion as to the duration of probable

cause is the inherent nature of the crime. The Circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance."

Protracted and continuous activity is inherent in drug trafficking. *United States v. Bascaro,* 742 F.2d 1335 (11th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); *United States v. Tehfe, supra.*

■ In this case the information that the district court concluded was stale pertained to interviews with two different confidential informants which were conducted from one to four months before the search warrant was issued. The first confidential informant provided four month old information generally pertaining to drug trafficking by Ringquist and Kitchen. The second confidential informant's information included four month old information about Ringquist's activities after a robbery of a Dickinson pharmacy. Although the four month old information does not identify separate and specific instances of drug trafficking, *compare State v. Ennis,* 334 N.W.2d 827 (N.D.1983), *cert. denied,* 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983), we believe the magistrate and police could properly rely on that information to the extent that it established that Ringquist and Kitchen were involved with drug trafficking, a matter which was corroborated by their prior records. The first confidential informant also provided one month old information that Ringquist "was waiting for some dope to come in so he could make considerable amount of money so that he could get out of Dickinson." We do not believe this information was stale because, when corroborated by the information supplied by the anonymous informant's tip, it established protracted and continuous activity which is inherent in drug trafficking. We therefore conclude that the magistrate could properly rely on the one month old information in conjunction with the anonymous informant's tip

and the other independent police corroboration as well as the information that Kitchen and Ringquist were known to be involved in drug trafficking.

■ The anonymous informant provided the police with information rife with detail of a drug transaction in which he was involved on the previous night at an apartment belonging to "Little Richard" and Bob Kitchen. It cannot be seriously argued that this information did not provide a strong basis of knowledge for the anonymous informant's tip. The magistrate was informed that Kitchen and Ringquist had previous drug records and that the first confidential informant had indicated that Ringquist and Kitchen were into selling controlled substances. This effectively established that Ringquist and Kitchen were involved in drug trafficking. Less than one month before the search, the first confidential informant indicated that Ringquist was waiting for some dope to come in so he could make a lot of money and get out of Dickinson. The police considered the first confidential informant reliable because he had previously supplied information enabling drug agents to purchase controlled substances and had been a prosecution witness in a case resulting in a conviction on a burglary and theft charge. The police's independent investigation confirmed that a cable television outlet registered to Ringquist had recently been disconnected at the apartment where the unknown informant was involved in a drug transaction the previous night, and from that information, the magistrate could have reasonably concluded that Ringquist was getting ready to "get out of Dickinson." The police investigation also confirmed that the green 1968 Ford two-door car parked near the apartment building was registered to Ringquist and that Ringquist's description on file with the Motor Vehicle Department matched that given by the anonymous informant.

The evidence presented to the magistrate in this case is distinguishable from the information contained in the police officer's

affidavit[2] in *State v. Thompson*, 369 N.W. 2d 363 (N.D.1985). In *Thompson* we concluded that under *Gates*[3] the police officer's affidavit did not provide a substantial basis to support the magistrate's finding of probable cause because an anonymous informant's tip did not disclose any specific facts from which the informant concluded that the Thompsons had a large supply of marijuana in their home and were selling marijuana. In contrast, in this case the unknown informant provided specific details of a drug transaction at Ringquist's apartment on the previous evening.

In *Thompson* there was nothing in the police officer's affidavit to establish that the anonymous informant was the same person who had given a previous tip that resulted in another person's arrest and conviction. We noted that it would have been meaningful if the police officer's affidavit established that *"the anonymous informant was the same person who provided accurate information to law enforcement officers in the past." State v. Thompson, supra,* 369 N.W.2d at 369 [Emphasis in original]. In this case Officer Haag specifically testified that the first confidential informant, who had provided the four and

one month old information, was reliable because that informant had previously supplied information enabling drug agents to purchase controlled substances and had been a prosecution witness in a case resulting in a conviction on a burglary and theft charge. In this case the police also testified that they knew that Kitchen and Ringquist both had previous drug records, a factor not present in *Thompson*. Moreover, the magistrate was also presented with corroborating evidence about the cable television outlet from which he could have reasonably concluded that Ringquist was getting ready to "get out of Dickinson."

Although each bit of information in this case, by itself, may not be enough to establish probable cause and some of the information may have an innocent explanation, " 'probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers ... [which is not weighed in] individual layers but [in] the "laminated" total.' " *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir.1978) (en banc), *cert. denied*, 439 U.S.

2. The police officer's affidavit provided in relevant part:

"'On February 15, 1984, at about 10:00 a.m., CST, the North Dakota Drug Enforcement Unit in Bismarck, North Dakota, received an anonymous phone call. The caller told them that Randy and Jackie Thompson, who live outside of Zap, North Dakota, presently have a large supply of marijuana in their house. According to the informant, Randy and Jackie Thompson lived inside the city of Zap until a short time ago when they moved to a farmstead. Randy Thompson was described as being heavy set, five feet ten inches tall, with dark hair and is approximately 30 years old. Jackie Thompson was described as a large woman with light hair and who is 27 or 28 years old. The informant said, further, that both Randy and Jackie Thompson work at a power plant near Beulah, North Dakota, and that Jackie Thompson, specifically, works in the office at the power plant. The Thompsons, according to the informant, drive a blue and white pickup with a camper on it.

"This informant advised the Drug Enforcement Unit that she had provided information against a Mr. Mike Stockert in May of 1983. The information she provided against Mr. Stockert proved to be correct in every detail,

and Mr. Stockert is presently serving time in the North Dakota State Pennitentiary [sic] as a result of this information.

"'Acting on the above information, I have verified that Randy and Jackie Thompson did live in the city of Zap until shortly before Christmas. At that time, they moved to the Edward Bauer farmstead located in the Northeast quarter of Section 14, Township 146, Range 89. Jackie Thompson works cleaning the office at the Great Plains Coal Gasification Associates. Randy and Jackie Thompson own a blue and white 1978 Ford Pickup, license number TCW–499 which has a topper or camper on it.

"'The anonymous informant advised the Drug Enforcement Unit that Randy and Jackie Thompson were selling marijuana in Bismarck on February 11, 1984. They were driving their blue and white pickup at the time.'" *State v. Thompson, supra*, 369 N.W.2d at 364.

3. Although we analyzed the facts in *Thompson* under the *Gates* totality-of-the-circumstances test, we specifically intimated no view on whether or not we would chart an independent course under the North Dakota Constitution with regard to the standards applicable to ascertaining the validity of a search warrant. *State v. Thompson, supra*, 369 N.W.2d at 372, fn. 5.

968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978), quoting *Smith v. United States*, 358 F.2d 833, 837 (U.S.App.D.C.1966), *cert. denied*, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). Viewing the evidence in this case in that manner and under the totality of the circumstances, we conclude that the magistrate had a substantial basis for concluding that probable cause existed for the issuance of a search warrant pursuant to the State and Federal Constitutions.

We therefore conclude that the district court erred in suppressing the evidence obtained during the search and we remand to the district court for proceedings consistent with this opinion.[4]

ERICKSTAD, C.J., and VANDE WALLE, J., concur.

MESCHKE, J., concurs in the result.

VANDE WALLE, Justice, concurring specially.

I agree with Justice Levine that the search warrant meets the test set forth in *Aguilar v. State of Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1929). In light of that conclusion, it may not appear necessary to consider whether or not to adopt the totality-of-the-circumstances test set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); nevertheless, I concur in the opinion written for the court by Justice Gierke if only to finally determine the issue of whether we will or will not adopt *Gates*, an issue which we have left open [*State v. Thompson*, 369 N.W.2d 363 (N.D.1985)], and which, until it is settled, is sure to continue to take the time and paper of brief writers and the time of this court on each occasion in which the validity of a search warrant is at issue.

Were I given to "handwringing" I might also concur with Justice Levine that we should not stray too far from our construction of *Aguilar* and *Spinelli*. But, just as she is concerned with the unnecessary handwringing by the United States Su-

preme Court in *Gates*, at least insofar as North Dakota is concerned, so, too, do I believe her concern for the lack of protection for our North Dakota residents under *Gates* is unnecessary. I agree that we have never applied *Aguilar* and *Spinelli* hypertechnically. In *State v. Thompson*, in which the majority opinion discussed, but did not adopt, the "good-faith exception" of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), I observed, in a special concurrence, that "our application of that exclusion will be little different from the 'totality of the circumstances' standard of review of *Gates*, ..." *State v. Thompson*, 369 N.W.2d at 375 (VandeWalle, J., concurring specially). So, too, I conclude that our application of the totality-of-the-circumstances test of *Gates* will not result in any significant dilution of the rights of our citizens.

I do not concede we are abandoning *Aguilar–Spinelli* for some amorphous standard. Rather, I interpret the adoption of *Gates* to simply confirm our past practice of a "common-sense interpretation" of the entire evidence presented to the magistrate [*State v. Ronngren*, 361 N.W.2d 224, 230 (N.D.1985)]. Such a posture will serve as notice to advocates who continue to cite to us the cases from those jurisdictions which do apply *Aguilar–Spinelli* hypertechnically, while at the same time serving as notice to law enforcement that it is not free to stray far from our previous interpretation and application of *Aguilar–Spinelli*. Although the *Aguilar–Spinelli* guidelines are lauded for their "predictability and stability" and are referred to as "clearly expressed and clearly reviewable," it is apparent that they are far from "bright-line" standards, for if they were we could not have adopted a "common-sense" approach while other jurisdictions have adopted more technical applications. The number of pages written concerning the applications of the guidelines belies any precise predictability, clarity of expression, or the ease of review. Rather, as we have already stated, "Whether or not

---

**4.** Because of our resolution of this issue we express no opinion on the issue of the "good-

faith" exception to the exclusionary rule. *See State v. Thompson, supra.*

probable cause exists depends on the facts and circumstances of each case, ..." *State v. Berger*, 285 N.W.2d 533, 536 (N.D.1979).

Finally, as Justice Levine candidly admits, the language of our State Constitution, Article I, Section 8, does not significantly differ from the Fourth Amendment language of the United States Constitution. It seems enigmatic to, on the one hand, observe that the history of our State Constitution reveals an intention to make its provisions of basic rights broader than those in the Federal Constitution and, on the other hand, recognize that prior to *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), evidence obtained through a search and seizure without legal justification was admissible if it tended to prove that the defendant committed an offense. *State v. Lacy*, 55 N.D. 83, 212 N.W. 442 (1927).

Although I agree we need not merely echo the United States Supreme Court in applying our own constitutional provisions which are identical to the Federal Constitution, I cannot agree that the interpretation and application of those provisions should merely reflect the philosophy or views of the particular justices who happen to be sitting at the time the issue of the application and interpretation of our State Constitution is raised.

LEVINE, Justice, concurring and dissenting.

Dissents are usually written to persuade the majority or, failing that, to register disagreement with the rationale or holding of the majority. This dissent serves the latter purpose. I have already expressed my view that in the area of search and seizure a state may and indeed should provide greater protection for its citizens under the state constitution than is provided by the United States constitution. *See State v. Thompson*, 369 N.W.2d 363 (N.D. 1985) (Levine, J., concurring). I adhere to the position that our state constitution ought to have a life of its own in the area of fundamental rights and individual liberties. Otherwise it becomes a mere appendage to the United States constitution and I

cannot accept the notion that a state's sovereign law should be reduced to a mere "me too" or "ditto." That flies in the face of federalism and disregards the structure and substance of the American polity.

I understand that I would have an easier row to hoe if the language of our state constitution, Article I, § 8, differed meaningfully from the fourth amendment to the United States constitution. *See State v. Jackson*, 102 Wash.2d 432, 688 P.2d 136, 141 (1984); *People v. Kershaw*, 147 Cal. App.3d 750, 195 Cal.Rptr. 311, 312 n. 2 (2 Dist.1983). *But see State v. Johnson*, 68 N.J. 349, 346 A.2d 66, 68 (1975) (indentically phrased provision of the New Jersey constitution gives greater protection than fourth amendment). It would help too if, before *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and its holding that illegally obtained evidence violates due process and must be excluded from state criminal trials, we had not historically applied the common law rule that illegally obtained evidence was admissible. *State v. Lacy*, 55 N.D. 83, 212 N.W. 442 (1927); *State v. Fahn*, 53 N.D. 203, 205 N.W. 67 (1925). *Compare State v. Gibbons*, 118 Wash. 171, 203 P. 390 (1922) (Washington adopts exclusionary rule). However, the history of the adoption of our state constitution reveals an intention to make the state constitution's array of basic rights broader than those in the federal constitution. *See* Boughey, *An Introduction to North Dakota Constitutional Law: Contents and Methods of Interpretation*, 63 N.D.L.Rev. 157, 255–59 (1987).

True to that proposition, we have applied the state constitution to afford more protection than the United States constitution. In *State v. Stockert*, 245 N.W.2d 266 (N.D. 1976) we held that whether or not a warrantless search of an immobilized automobile located on private property violated the fourth amendment, it nonetheless violated the North Dakota state constitution. *See also State v. Orr*, 375 N.W.2d 171 (N.D. 1985) (art. I, § 12, North Dakota constitution, provides a broader right to counsel than does federal constitution). We have

also viewed North Dakotans as placing a high value on privacy. *See State v. Sakellson,* 379 N.W.2d 779 (N.D.1985). Our constitution recognizes and protects that value. N.D. Const. art. I, § 8; N.D. Const. art. I, § 1. *Cf. Grand Forks v. Grand Forks Herald,* 307 N.W.2d 572 (N.D.1981). So has our legislature. *See e.g.,* NDCC § 39–20–01 (Implied Consent law) (a driver of a vehicle must actually consent to a chemical test before it may be given).

Furthermore, there is another principle applicable to interpreting the state constitution to provide broader protection than its federal counterpart and that is a "noninterpretive" review proceeding from a judicial perception of sound policy, justice and fundamental fairness. *See People v. P.J. Video, Inc.,* 68 N.Y.2d 296, 508 N.Y.S.2d 907, 911, 501 N.E.2d 556, 560 (1986).

As a matter of public policy we should afford more protection to our citizens to be free from unreasonable search and seizures than is now offered under the United States constitution because of the dilution of the *Aguilar–Spinelli* standards. We have relied on and applied the *Aguilar–Spinelli* probable cause standard for eighteen years. *See State v. Dove,* 182 N.W.2d 297 (N.D.1970). It has worked well in providing clear guidelines for law enforcement and the judiciary. The predictability and stability inherent in the *Aguilar–Spinelli* probable cause test are worth preserving and perpetuating under our state constitutional jurisprudence in order to ensure enforcement that is governed by clearly expressed and clearly reviewable guidelines, namely the basis of knowledge and veracity prongs of *Aguilar–Spinelli,* rather than the standardless standards and guideless guidelines of the *Gates* "totality of circumstances" test.

It is an exquisite irony that the very reason for the *Gates* decision, namely the misapplication and distortion of *Aguilar–Spinelli* so that it was applied hypertechnically and in effect unreasonably rigidly, has no application to North Dakota jurisprudence. The *Gates* court, in its criticism of the abuse of the *Aguilar–Spinelli* guidelines, could not possibly have had North Dakota in mind. It is telling that in *Gates,* the majority relied on *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) to support the adoption of its relaxed standards. Our court has been regularly applying *United States v. Ventresca* in its interpretation of *Aguilar–Spinelli.* In *State v. Mertens,* 268 N.W.2d 446, 448 (N.D.1978) Justice Sand, writing for a unanimous court, relied on the language of *United States v. Ventresca, supra,* in applying *Aguilar–Spinelli:*

"In determining whether or not the affidavit establishes the required probable cause for a search warrant, we apply practical rather than abstract concepts. The magistrates and the courts interpret the affidavits in a commonsense and realistic fashion. Usually such affidavits are drawn by non-lawyers and seldom under ideal conditions. Technical common law pleadings are no longer desirable or required, and likewise neither should technical language be required in an affidavit for a search warrant."

So too, the same position was expressed in *State v. Ronngren,* 361 N.W.2d 224, 230 (N.D.1985), by Justice VandeWalle writing for a unanimous court: "Under the *Aguilar–Spinelli* requirements, the determination of whether or not probable cause exists to issue a search warrant is to be based on a common-sense interpretation of the entire evidence presented to the magistrate." To the same effect is *State v. Klosterman,* 317 N.W.2d 796, 801 (N.D. 1982).

My point is that the United States Supreme Court's handwringing in *Gates* is, as far as North Dakota is concerned, preaching to the choir. We have never reduced *Aguilar–Spinelli* to a mechanical, rigid, technical set of rules. If other states have, let them adopt *Gates* since they have been unable to work with *Aguilar–Spinelli.*

In all the cases I have reviewed, I have found but a scant few that have ruled in favor of suppression for failure to meet the *Aguilar–Spinelli* two-prong test. *See e.g., State v. Schmeets,* 278 N.W.2d 401 (N.D. 1979); *State v. Spoke Comm. Univ. Ctr.,* 270 N.W.2d 339 (N.D.1978). That tells me

that law enforcement officers in North Dakota have successfully educated themselves to comply with *Aguilar–Spinelli* and that magistrates and judges have avoided stultifying reasonable police practice by demanding nothing more than reasonable disclosure of the underlying basis for a search warrant. Our North Dakota experience validates Justice Brennan's opinion that the *Aguilar–Spinelli* standard "help[s] to structure-probable cause inquiries and, properly interpreted, may actually help a nonlawyer magistrate in making a probable cause determination." *Gates*, 462 U.S. at 288, 103 S.Ct. at 2358 (Brennan, J., dissenting).

By adopting *Gates*, we set law enforcement adrift with nothing but our pious exhortations that they not forget about *Aguilar–Spinelli*, although we give them nothing to replace it except some amorphous standard of "totality of the circumstances." It is one thing to bestow such wide-ranging discretion on trial judges. It is quite another to do the same for law enforcement personnel.

There is nothing sinister or untoward in interpreting our state constitution to provide greater protection to our citizens than is afforded by the federal constitution. The federal constitution simply sets a floor of protections, not a ceiling. State courts are free to interpret their own law and to supplement or expand upon the rights guaranteed by the federal constitution. *See e.g., City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 292, 102 S.Ct. 1070, 1076, 71 L.Ed.2d 152 (1982); *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040–2041, 64 L.Ed. 2d 741 (1979); *see* S. Herman, How to Defend and Decide Constitutional Law Claims, 14 Search and Seizure Law Report, No. 11 at 169 (2 ed. 1987).

I would thus apply the *Aguilar–Spinelli* test to the facts at hand and would reverse the trial court's suppression on the grounds that both prongs of the *Aguilar–Spinelli* test have been satisfied. There is little

question that the basis-of-knowledge prong has been fulfilled. The anonymous informant's tip was based here on firsthand observation which is the most acceptable way of proving that the informer obtained the information in a reliable way. *See* W. LaFave, Search and Seizure § 3.3(a) (1987).

It is the veracity prong that creates the problem. However, we have often stated that in a close case any doubt should be resolved in favor of the magistrate's determination of probable cause. *E.g., State v. Metzner,* 338 N.W.2d 799 (N.D.1983). To establish the veracity prong, when the informant's track record is unknown, as is the case here, reliance may be had on independent police investigation that corroborates the tip. In *State v. Thompson, supra* at 364, we recognized that "completely innocent activity can provide sufficient corroboration in some circumstances." Here, I believe that the police investigation and discovery of Ringquist's prior drug conviction, his co-tenancy with Kitchen, also a person with a drug-background, police information garnered from the prior informant about continuous drug activity (and therefore, as the majority correctly analyzes, not "stale") are sufficient to provide the anonymous informant's tip with the reliability necessary to fulfill the veracity prong of the *Aguilar–Spinelli* test for probable cause. Whether the tip by itself is sufficient is not the point. Here, the police did undertake investigation and did obtain information that I believe fulfilled the probable cause requirements when viewed nontechnically and in commonsense fashion. Therefore, I believe that the majority does not have to proceed beyond analyzing the trial court's suppression on the basis of *Aguilar–Spinelli* because the trial court erred under that standard, much the same as the majority in *Gates* erred by failing to properly analyze the facts under *Aguilar–Spinelli* in that case. *See Gates* (White, J., concurring). In a fit of pique, the majority in *Gates*, literally abandoned the baby with the bath water. Instead of overruling suppression on the grounds that the *Aguilar–Spinelli* two-prong test had

been applied over-rigorously and hypertechnically by the Illinois courts, as Justice White suggested, the majority simply threw up its hands and threw out *Aguilar–Spinelli.* I fear that is what we do in the present case. Therefore, while I concur in the reversal, I dissent from the adoption and application of *Gates* as a matter of state constitutional law.