The STATE of North Dakota,
Plaintiff and Appellee,

v.

Mark HANDTMANN, Defendant
and Appellant.

The STATE of North Dakota,
Plaintiff and Appellee,

v.

Sheila FUHRMAN, Defendant
and Appellant.

Cr. Nos. 880176, 880215.

Supreme Court of North Dakota.

March 21, 1989.

Wayne D. Goter, Asst. State's Atty., Mandan, for plaintiff and appellee.

William D. Schmidt, of Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for defendant and appellant Mark Handtmann.

Donald R. Becker, Fargo, for defendant and appellant Sheila Fuhrman.

VANDE WALLE, Justice.

Mark Handtmann and Sheila Fuhrman appealed from convictions for drug-related offenses entered upon conditional pleas of guilty under Rule 11(a)(2), N.D.R.Crim.P., after the district court denied their motions to suppress evidence seized during a search of their house pursuant to a search warrant issued by the Morton County Court. We reverse and remand.

The application for the search warrant consisted of the testimony of Detective Dennis Bullinger, the deputy chief of police for the City of Mandan. Bullinger testified that at about 12:35 p.m. on July 17, 1987, he received an anonymous telephone call from a female informant who he believed was in her early or mid-twenties. The anonymous informant told Bullinger that on two separate occasions, once shortly before she had called Bullinger and once two days before the call, she had seen marijuana at a house in Mandan belonging to a family by the name of Begley; that the house was located at the top of the hill on Collins Avenue and was yellow with a red porch; that a former resident of the Bismarck–Mandan area, whose identity she did not know, was currently at the house to drop off marijuana and would be making other drug deliveries in the area; that the Begleys owned a blue Chevy automobile and a 1969 maroon pickup which were parked at the house; and that the man delivering the marijuana drove a blue car which was also parked at the house.

Bullinger testified that he immediately went to Collins Avenue and confirmed that the only yellow house with a red porch on that avenue belonged to the Begleys and was located at 811 Collins Avenue. Bullinger also confirmed that a blue Chevrolet automobile and a maroon 1969 Ford pickup were parked at the house and that a blue Honda Civic registered to Jeff Stockert of Grafton was parked in front of the house. Bullinger testified that he knew Stockert had previously lived in the Bismarck–Mandan area and had been charged with possession of a controlled substance as a juvenile in 1984, but Bullinger testified that he

did not know the disposition of that charge. Officer John Bartlett, who was with Bullinger at the time, told Bullinger that Stockert and he had graduated from high school in the same year and that Stockert was a "low-life dirt bag."

Bullinger established surveillance of the Begley house, and at 12:55 p.m., he observed Stockert leave the house and followed him to the defendants' house at 509 Fourth Avenue Northeast in Mandan. Bullinger testified that the surveillance team was unable to see whether or not Stockert carried anything into or out of the defendants' house. Bullinger testified that he personally knew Handtmann and described him as "suspected of trafficking narcotics." Bullinger also related that Captain Maxon of the Mandan Police Department had told him that an informant had information about Handtmann's involvement in narcotics, but Bullinger did not otherwise elaborate on that involvement. Bullinger inaccurately stated that Handtmann had a "mini 14" automatic rifle when, in fact, Handtmann had reported that gun stolen. Bullinger also gave the following inaccurate information about Handtmann:

[Mr. Bullinger]: "He [Handtmann] has just recently, by surveillance done by the City of Bismarck just in the last two, three days, been observed at a known narcotic-dealing residence. As a matter of fact, we're in the process of getting a search warrant right now for that. Mr. Handtmann has been seen there I was told this morning.

"Q. [Mr. Goter] That's at the Burleigh County residence?

"A. The Bismarck Police Department is obtaining a search warrant for a Terry Miller residence.

"Q. It's the one where Mr. Handtmann was seen?

"A. That's correct.

"Q. Has Mr. Handtmann's name come up in recent drug manufacturing charges that were brought here in Morton County?

"A. Yes.

"Q. In what relationship?

"A. Mr. Handtmann is a friend of Clifford Zearley, and Richard Orvedal with Mr. Handtmann placed chemical in Mark Handtmann's mother's residence. He had placed it there for Clifford Zearley.

"Q. Did Mr. Orvedal—Richard Orvedal tell you that?

"A. Kenneth Kleinsasser told me." [1]

Stockert left the defendants' house at 1:58 p.m., and Bullinger followed him to a gas station in Mandan where Stockert stopped for three to four minutes. Stockert then left the gas station in his automobile and was followed by a person in a green Ford pickup that was registered to Roger Miller. Although Bullinger did not specifically identify the driver of the pickup as Miller, Bullinger testified that the police dispatcher had graduated from high school with Miller and had described Miller as a "cowboy-doper" who hung around with people that used narcotics in high school. Stockert and the person in the pickup both proceeded to a house located at 1003 4th Street Southwest in Mandan where they stayed for about thirty minutes. Bullinger testified that he did not know who lived at that location, but he knew that the owner was trying to sell the house and that search warrants for controlled substances previously had been issued to search that house.

When Stockert left that house, Bullinger followed him to Memorial Highway and stopped him. When Bullinger approached Stockert's automobile, he detected the odor

---

1. At the subsequent suppression hearing Bullinger testified that he and Bismarck police officer Steve Cleveland had discussed two separate drug investigations on the morning of July 17, 1987, one involving Handtmann and one not, and that when Cleveland mentioned Handtmann, he was not referring to him as having been seen at a known drug dealer's house in Bismarck. Instead, Bullinger testified at the suppression hearing that the information given to him by Cleveland was that Handtmann was involved in sales of marijuana.

Bullinger also testified at the suppression hearing that Handtmann's mother had not stored lab equipment and chemicals for a person involved in a drug-manufacturing operation, but had stored other personal property for that person.

of marijuana and observed paper and burnt plant material in the ashtray and green plant material that appeared to be marijuana on the dash. Stockert told Bullinger that he had marijuana that he had purchased in the car. Stockert was arrested for both possession and delivery of a controlled substance.

Bullinger testified that Stockert had money in two separate pockets when he was arrested but that, in order to preserve fingerprints, the money had not been counted at the time of the application for the search warrant. Bullinger further testified that another police officer related that Stockert had said that he had "approximately $300." However, when the money was counted after the search warrant was issued and the search was conducted, it was determined that Stockert had only $78 instead of "approximately $300."

Bullinger told the county court that he had fourteen years of experience with the Mandan Police Department and previously had been involved with a number of surveillances of suspected drug activities, including the delivery of controlled substances. Bullinger described Stockert's pattern of short visits as the type he would expect from someone who was making deliveries of controlled substances. However, Bullinger also testified that the surveillance team could not see whether Stockert took anything into or out of any of the houses he had visited. Bullinger testified that Stockert did not say anything about marijuana being at any of the houses where he had stopped; however, Bullinger testified that Stockert's eyes "lit up" when Bullinger mentioned those addresses.

The county court issued a search warrant for the Begley house, the defendants' house, the house at 1003 4th Street, and Stockert's automobile. According to Bullinger the searches of Stockert's automobile and the three houses were begun simultaneously. While the defendants' house was being searched, the police learned that a small amount of marijuana had been found at the Begley residence, in Stockert's car, and at the house at 1003 4th Street. The search of the defendants' house uncovered drug paraphernalia, marijuana, and over $14,000 in cash.

Handtmann and Fuhrman were both charged with possession of drug paraphernalia, possession of a controlled substance, and possession of a controlled substance with intent to deliver. The defendants moved to suppress the evidence seized from their residence, contending that there was insufficient evidence to establish probable cause to search their house and that law-enforcement officials presented false evidence about Handtmann in support of the search warrant. The State resisted, contending that there was sufficient evidence to support the search warrant and that the seized evidence would have been inevitably discovered.

After an evidentiary hearing, the district court denied the defendants' motion to suppress the evidence. The court concluded that even excluding the false statements about Handtmann, there was sufficient evidence presented to the county court to establish probable cause for the issuance of the search warrant. The court further concluded that even if there was not probable cause for the issuance of the search warrant, the police had not acted in bad faith to accelerate the discovery of the evidence and that it would have been inevitably discovered.

Handtmann then entered conditional pleas of guilty to all the charges, and Fuhrman entered conditional pleas of guilty to possession of drug paraphernalia and possession of a controlled substance.[2] The district court accepted the defendants' conditional guilty pleas, and they have appealed.

The defendants contend that insufficient evidence was presented to the county court to establish probable cause for the issuance of a search warrant to search their house, and therefore the search violated the Fourth and Fourteenth Amendments of the

---

**2.** The State dismissed the charge against Fuhrman for possession of a controlled substance with intent to deliver.

United States Constitution and Article I, § 8, of the North Dakota Constitution. They argue that the county court was not presented with sufficient evidence to establish the anonymous informant's veracity or basis of knowledge and that none of the anonymous informant's information implicated them. In conjunction with that argument, the defendants also assert that Bullinger's false statements about Handtmann were made intentionally or with reckless disregard for the truth and must be disregarded.

The State responds that the county court had a substantial basis for concluding that probable cause existed for the issuance of the search warrant because the reliability and credibility of the anonymous informant were firmly corroborated. The State concedes that some of Bullinger's testimony in support of the search warrant was false, but argues that the district court implicitly found that Bullinger did not make those false statements intentionally or in reckless disregard for the truth when it concluded that the police officers had not acted in bad faith to accelerate discovery of the evidence. The State thus argues that that finding is not clearly erroneous. Moreover, the State asserts in its brief to this court that even without the inaccurate statements, there was sufficient evidence to issue the search warrant because there was evidence that:

> "[A]n anonymous but reliable informer with first hand knowledge reported that Stockert was selling marijuana at the Begley's and would be engaged in a drug transaction at localities in the area other than at the Begley residence; Stockert left the Begleys to go to the defendants' residence and then, after making one other clandestine, prearranged rendezvous with another individual, Stockert was stopped and by his own admission was in possession of marijuana which he had purchased."

In assessing whether or not the county court was presented with sufficient evidence to establish probable cause, we are guided by the following standard:

> "Probable cause to search does not require the same standard of proof necessary to establish guilt at trial; rather, probable cause to search exists if it is established that certain identifiable objects are probably connected with criminal activity and are probably to be found at the present time at an identifiable place." *State v. Ringquist,* 433 N.W.2d 207, 212 (N.D.1988).

In *State v. Ringquist, supra,* 433 N.W. 2d at 211, we recently adopted the totality-of-the-circumstances test for reviewing probable cause under Art. I, § 8, of the North Dakota Constitution, thus following the same standard required under the Fourth Amendment of the United States Constitution and *Illinois v. Gates,* 462 U.S. 213, 238–239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983):

> " 'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.' "

Although we adopted the totality-of-the-circumstances test, we cautioned that more than "bare-bones" information must be presented to the magistrate and that bare conclusions are insufficient to establish probable cause. *State v. Ringquist, supra,* 433 N.W.2d at 213. See *State v. Thompson,* 369 N.W.2d 363 (N.D.1985); see also, *State v. Schmeets,* 278 N.W.2d 401 (N.D.1979), for a discussion of the specificity required.

In this case we do not believe that the evidence presented to the county court, including the concededly false information, establishes a substantial basis for believing that evidence connected with criminal activity would probably be found at the defendants' house. Although there was information that marijuana was present at the

Begleys' house, Bullinger did not testify that the anonymous informant related any information about the presence of marijuana or other evidence connected with criminal activity at the defendants' house [*compare State v. Ringquist, supra*], or that the anonymous informant even knew the defendants. Bullinger testified that the anonymous informant said that a person, later identified as Stockert, was making drug deliveries and that Stockert's pattern of short stops was consistent with drug deliveries; however, Bullinger testified that the surveillance team could not see whether Stockert took anything into or out of the defendants' house or any of the other places where Stockert stopped. Bullinger did not testify about any information related by the anonymous informant that would indicate that a drug delivery would occur at the defendants' house. In the absence of evidence that the surveillance team saw Stockert take anything into the defendants' house or in the absence of other reliable information about Handtmann, we do not believe that the evidence about Stockert and the anonymous informant's statements were sufficient to authorize the issuance of a warrant to search the defendants' house merely because Stockert stopped at their house.

■ Moreover, in our view, the specific information about Handtmann, including the false information, represents only unsupported conclusions and statements about his reputation of being "suspected of trafficking narcotics" which, without some elaboration of the underlying circumstances for those conclusions and statements, are insufficient to support a determination that probable cause existed. 1 W. LaFave, § 3.2(d) (2d ed.1987); *State v. Ringquist, supra; State v. Thompson, supra; State v. Ronngren*, 361 N.W.2d 224 (N.D.1985); *State v. Schmeets, supra.* Our cases have consistently required more than mere statements of reputation or unsupported conclusions and allegations to establish probable cause.

In *State v. Thompson, supra*, and *State v. Schmeets, supra*, we held that conclusory statements, without elaboration of the underlying circumstances supporting those conclusions, were insufficient to support probable cause. In both *Thompson* and *Schmeets* we concluded that statements that the defendants had drugs at their residences, without some elaboration of the underlying basis for those statements, were insufficient to establish probable cause.

We have also permitted the use of evidence of reputation, with other evidence, to support a determination of probable cause. *State v. Ringquist, supra; State v. Ronngren, supra.* In *State v. Ringquist* the evidence of reputation was in addition to an anonymous informant's detailed information about a drug transaction the previous night at the defendant's apartment, the prior drug records of the occupants of the apartment and other independent police corroboration. Additionally, the defendant's reputation was demonstrated by specific underlying circumstances. In *State v. Ronngren, supra*, we concluded that evidence of marijuana in a garbage bag which had been removed from the defendants' property by a dog, when considered with evidence of 15 to 20 vehicles at the defendants' house during a 13–hour period and statements regarding the reputations of the owners of those vehicles, was sufficient to support a determination of probable cause. In both of those cases there was information that evidence of a crime had been seen at the residences that were searched, information which is lacking in this case.

In this case the false information and conclusions about Handtmann did not substantiate that Stockert had made a drug delivery at the defendants' house or that there was currently evidence connected with criminal activity there. We believe the information about Stockert and his stop at the defendants' house coupled with Handtmann's "reputation" may have made the police suspicious about the presence of evidence of criminal activity at the defendants' house, but that suspicion, without anything more specific about these defendants, does not amount to probable cause to search their house.

We recognize that deference is ordinarily given to a magistrate's determination of probable cause [*State v. Mertens*, 268 N.W. 2d 446 (N.D.1978); *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed. 2d 684 (1965)]; however, in view of both the conclusory and false statements [3] about Handtmann which undoubtedly provided an important link in the county court's determination of probable cause, we cannot give that deference to the county court's determination in this case. See 2 W. LaFave, § 4.4(c) (2d ed. 1987). We therefore conclude that there was not a substantial basis for issuance of the search warrant.[4] Thus the evidence seized pursuant to that search warrant was illegally obtained.

Alternatively, the State contends that the search can be validated under the inevitable-discovery doctrine because of other evidence discovered after the warrant was issued. The State relies upon Officer Bartlett's testimony at the suppression hearing that when Stockert learned that a search warrant was being sought for the defendants' house, he became very agitated and asked Officer Bartlett to let him call Handtmann to get the "stuff" out, and also told Bartlett that "if they find all that stuff, I'm gone." Stockert also told Bartlett, "they hit the jackpot, I don't know how, but they did." The State also relies on the seizure of marijuana from Stockert's car and the Begley residence pursuant to the search warrant and argues that the inevitable discovery was supported by Bullinger's testimony that if a search warrant had not been obtained when it was, he would have appeared before the magistrate later that day and presented the additional evidence in an application for a warrant to search the defendants' house. The State thus contends that the facts of this case fall within the inevitable-discovery exception to the exclusionary rule.

The exclusionary rule requires suppression of evidence obtained in a search that violates the Fourth Amendment. *State v.*

---

**3.** In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court outlined the standards under the Fourth and Fourteenth Amendments for challenging the veracity of factual statements made to obtain a search warrant. Pursuant to *Franks* an evidentiary hearing is required if: (1) a defendant makes a substantial preliminary showing, accompanied by an offer of proof, that false statements were made in support of a search warrant, either knowingly and intentionally or with reckless disregard for the truth, and (2) the allegedly false statements are necessary to a finding of probable cause. No evidentiary hearing is required if there remains sufficient evidence to support a finding of probable cause without the allegedly false statements, and allegations that false statements were negligently or innocently made are insufficient to necessitate an evidentiary hearing. *Franks, supra; State v. Padgett*, 393 N.W.2d 754 (N.D.1986). The allegations should specify the statements that are claimed to be false and should be accompanied by a statement of supporting reasons. *Franks, supra; Padgett, supra.* Affidavits or other reliable nonconclusory statements of witnesses should be furnished, or their absence satisfactorily explained. *Franks, supra; Padgett, supra.*

If an evidentiary hearing is required, the defendant must establish by a preponderance of evidence that the false statements were made either knowingly and intentionally or with reckless disregard for the truth, and the court's determination on that issue is a finding of fact reviewed under the clearly erroneous standard.

*State v. Padgett, supra.* If the defendant carries that burden of proof and, with the false statements set aside, the remaining evidence is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as a search warrant issued without probable cause. *Franks, supra.* Conversely, false statements made in support of a search warrant may be considered in assessing whether probable cause exists if those statements were not made either knowingly and intentionally or with reckless disregard for the truth. *Franks, supra;* see 2 W. LaFave, Search and seizure, § 4.4 (2d ed. 1984).

The parties agreed that the *Franks* issues were addressed and heard in the context of the suppression hearing, but the district court did not make a finding about whether the false statements were made knowingly and intentionally or with reckless disregard for the truth. Instead, the district court concluded that "[e]xcluding the statements regarding Handtmann's criminal activities that were found not to be true, there was sufficient evidence presented to the magistrate to establish probable cause for the issuance of the search warrant." Because of our conclusion that, even with the inaccurate evidence, there was insufficient evidence to establish probable cause to search the defendants' house, we express no opinion on any *Franks* issues.

**4.** We express no opinion on whether or not a search warrant was properly issued to search Stockert's car or either of the other houses.

*Phelps,* 297 N.W.2d 769 (N.D.1980). Where there has been an unlawful search and seizure, the exclusionary rule operates as a judicial sanction against law enforcement intrusion into an individual's Fourth Amendment right to privacy. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The exclusion of unlawfully obtained evidence serves two underlying policy considerations: (1) compelling respect for the constitutional guaranty against unreasonable searches and seizures by removing the incentive to disregard that guaranty, and (2) bolstering judicial integrity by not allowing convictions based on unconstitutionally obtained evidence. *Mapp v. Ohio, supra.*

The fruit-of-the-poisonous-tree doctrine is an extension of the exclusionary rule and prohibits the indirect use of information obtained in illegal searches and seizures. *State v. Phelps, supra.* In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the United States Supreme Court said that the proper inquiry for determining if proffered evidence is fruit of the poisonous tree is whether the evidence was obtained by exploitation of the illegal action or by means sufficiently distinguishable to be purged of the primary taint.

The inevitable-discovery doctrine provides that evidence derived from information obtained in an unlawful search or seizure is not inadmissible under the fruit-of-the-poisonous-tree doctrine if it is shown that the evidence would have inevitably been discovered without the unlawful action. *State v. Phelps, supra.* In *State v. Phelps,* this court held that the inevitable-discovery doctrine was a part of North Dakota law as an exception to the exclusionary rule and a necessary corollary of the fruit-of-the-poisonous-tree doctrine. We adopted the following two-part test [5]

5. In *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the United States Supreme Court adopted the inevitable-discovery exception to the exclusionary rule and held that, in order to invoke the doctrine, the prosecution must establish by a preponderance of evidence that the information or evidence inevitably would have been discovered by lawful means. The Supreme Court specifically rejected the requirement that the prosecution must prove the absence of bad faith, stating:

"The requirement that the prosecution must prove the absence of bad faith, imposed here by the Court of Appeals, would place courts in the position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity. Of course, that view would put the police in a *worse* position than they would have been in if no unlawful conduct had transpired. And, of equal importance, it wholly fails to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice. Nothing in this Court's prior holdings supports any such formalistic, pointless, and punitive approach.

"The Court of Appeals concluded, without analysis, that if an absence-of-bad-faith requirement were not imposed, 'the temptation to risk deliberate violations of the Sixth Amendment would be too great, and the deterrent effect of the Exclusionary Rule reduced too far.' [*Williams v. Nix*], 700 F.2d [1164] at 1169, n. 5 [(8th Cir.1983)]. We reject that view. A police officer who is faced with the opportunity to obtain evidence illegally will rarely, if ever, be in a position to calculate whether the evidence sought would inevitably be discovered. Cf. *United States v. Ceccolini,* 435 U.S. 268, 283, 98 S.Ct. 1054, 1064, 55 L.Ed.2d 268 (1978):

"'[T]he concept of effective deterrence assumes that the police officer consciously realizes the probable consequences of a presumably impermissible course of conduct' (opinion concurring in judgment).

"On the other hand, when an officer is aware that the evidence will inevitably be discovered, he will try to avoid engaging in any questionable practice. In that situation, there will be little to gain from taking any dubious 'shortcuts' to obtain the evidence. Significant disincentives to obtaining evidence illegally—including the possibility of departmental discipline and civil liability—also lessen the likelihood that the ultimate or inevitable discovery exception will promote police misconduct. See *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971). In these circumstances, the societal costs of the exclusionary rule far outweigh any possible benefits to deterrence that a good-faith requirement might produce." *Nix v. Williams, supra,* 104 S.Ct. at 2509–2510. [Emphasis in original.]

That aspect of the *Nix* decision has been questioned for situations in which the police believe they have probable cause for the issuance of a warrant but nevertheless conduct a warrantless search. 4 W. LaFave, § 11.4(a), p. 383 (2d ed. 1987). Professor LaFave suggests that the only way to deter that type of calculated unconstitu-

for the application of the inevitable-discovery doctrine:

"First, use of the doctrine is permitted only when the police have not acted in bad faith to accelerate the discovery of the evidence in question. Second, the State must prove that the evidence would have been found without the unlawful activity and must show how the discovery of the evidence would have occurred.... A showing that discovery might have occurred is entirely inadequate." *State v. Phelps, supra,* 297 N.W.2d at 775.

■ We decline to apply the inevitable-discovery rule in this case because its application would render the warrant protections of the Fourth Amendment meaningless. It is well established that a search warrant issued upon insufficient evidence cannot be validated by information known when the warrant was sought but not disclosed to the issuing magistrate. *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); see 2 W. LaFave, § 4.3(a) (2d ed. 1987). The State's assertion that it would have obtained a lawful search warrant based upon the information subsequently discovered would emasculate the requirement for a search warrant under the Fourth Amendment. See *United States v. Griffin,* 502 F.2d 959 (6th Cir.), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974); see also, Note, *Inevitable Discovery: The Hypothetical Independent Source Exception to the Exclusionary Rule,* 5 Hofstra L.Rev. 137, 158 (1976); 4 W. LaFave, § 11.4(a) (2d ed. 1987).

We have said that the inevitable-discovery doctrine may not be applied to encourage shortcuts by law-enforcement officials which eliminate a neutral and detached magistrate's probable-cause determination. *State v. Johnson,* 301 N.W.2d 625 (N.D.1981). Application of the inevitable-discovery doctrine in this case would encourage law-enforcement shortcuts whenever evidence may be more readily obtained by unlawful means—a result at odds with the purpose of the exclusionary rule to deter police from obtaining evidence in an illegal manner. Moreover, judicial sanctioning of the doctrine in this case would also encourage incomplete police investigations in the hope that information subsequently discovered would cure a defective warrant. We cannot legitimize that type of investigatory practice.

We therefore decline to extend the inevitable-discovery doctrine in this case based upon an assumption that a subsequent search conducted pursuant to a hypothetical search warrant would have resulted in the discovery of the disputed evidence.

The defendants' convictions are reversed and the cases are remanded for further proceedings consistent with this opinion.[6]

ERICKSTAD, C.J., and GIERKE and MESCHKE, JJ., concur.

LEVINE, J., concurs in the result.

---

tional conduct is to put the police in a worse position than they would have been in if the unlawful conduct had not transpired. *Id.* However, because of our resolution of this issue, we express no opinion on the applicability of the bad-faith component of the inevitable-discovery doctrine.

6. In its decision denying the defendants' motion to suppress, the district court stated that the "good-faith" exception to the exclusionary rule seemed to have applicability only if the search warrant was found to have been improperly issued. The State has made no argument for applying a "good-faith" exception to the exclusionary rule under the circumstances of this case. See *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We therefore decline to express an opinion on the applicability of a good-faith exception to the exclusionary rule under the circumstances of this case.