2003 ND 187

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Thomas DODSON, Defendant and Appellant.**

**No. 20030042.**

Supreme Court of North Dakota.

Dec. 2, 2003.

Rehearing Denied Jan. 14, 2004.

Mark A. Flagstad, Assistant State's Attorney, Minot, ND, for plaintiff and appellee.

Michael R. Hoffman, Bismarck, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Thomas Dodson appealed district court judgments against him for possessing methamphetamine paraphernalia and possessing methamphetamine with intent to deliver. We affirm.

I

[¶ 2] On November 1, 2001, a search warrant was issued for Dodson's residence at # 23 Parkview Trailer Court in Minot, Dodson's person, his vehicle, and any other person present at the premises. The affidavit requesting the search warrant was prepared by Steve Niebuhr, a Minot police officer assigned to the Ward County Drug Task Force. The affidavit described the following surveillance activity. On October 23, 2001, a vehicle with license plate number GLJ439 ("GLJ439") was observed at 541 Valley Street, Cynthia Kness' residence. GLJ439 was registered to Cathy Ceglowski. The task force had information the vehicle was currently being used by Paul Palmer, who was on probation in Williams County and was suspected of being involved in methamphetamine labs in the Williston area. Later that afternoon, a vehicle registered to Alisia Moncada was also seen at the house. She had methamphetamine charges pending against her and had lived with John Wilkins, Jr., who had shown people in Williston and Minot how to manufacture methamphetamine. Wilkins absconded after charges were brought against him.

[¶ 3] GLJ439 was later seen at Dodson's trailer located at # 23 Parkview Trailer Court. Niebuhr stated, "Dodson is known to be involved in the drug culture in Minot since 1991." According to the affidavit, there had been numerous reports regarding Dodson, and one Shamra Campbell stated he "does more than his share of buying and selling methamphetamine." When patrol officers were sent to his trailer for a domestic call, they were not allowed inside the trailer.

[¶ 4] Palmer and an unidentified male left the trailer in GLJ439 and went to Home of Economy. The unidentified male went into the store and Palmer followed later. Officer Niebuhr followed Palmer into the store. He saw the unidentified male leave with a bag and get into GLJ439. Palmer left without buying anything. The agents followed the vehicle back to Dodson's trailer. Officer Niebuhr and another officer went back to Home of Economy and a clerk told them a man who matched the description of the unidentified male bought a 32–ounce bottle of sulfuric acid (Mr. Plumber). Sulfuric acid can be used in the production of methamphetamine.

[¶ 5] The next day a search was conducted of a garbage bag seized from the alley behind 541 Valley Street. Four tinfoil bindles with burn marks, one tinfoil bindle with no burn marks, and documents with the name Ariel Moncada were found. Alisia Moncada's vehicle was also at the house. Monte Olson, who had been apprehended with marijuana and methamphetamine, told Officer Niebuhr that he and Kness were the main distributors of methamphetamine for Moncada and Wilkins.

[¶ 6] Four days later, another garbage bag was taken and searched from the alley behind Kness' house. It contained four empty packages of Equate Suphedrine (24 per package) and eight foils with burned residue. Suphedrine contains one of the main precursors for methamphetamine, and "[t]he amount found at one time is indicia of the manufacturing methamphetamine (sic)."

[¶ 7]   Two days later, there was a complaint from a resident of Parkview Trailer Court regarding heavy "come and go" traffic at Dodson's trailer between 2:00 a.m. and 4:00 a.m. Two days after that, a Home of Economy employee reported the unidentified male returned and purchased Naptha, which is another precursor to manufacturing methamphetamine. The employee was shown Dodson's picture and was "95% sure." He was the unidentified male who purchased the Naptha and sulfuric acid. The employee gave Officer Niebuhr the license plate number, GTY578, of the vehicle Dodson was driving and described it as a 15-year-old blue vehicle. Dodson owns a blue 1987 Olds Cutlass with license plate number GPY578.

[¶ 8]   Based upon the information provided, a search warrant was issued and Dodson was arrested as a result of the evidence seized during the search. Dodson moved to suppress the evidence. The district court denied his motion because it found the affidavit established probable cause, and even if it did not, the good faith exception to the exclusionary rule applied. Dodson entered conditional guilty pleas, reserving his right to appeal.

## II

[¶ 9]   Dodson contends the evidence discovered while conducting the search should have been suppressed because there was no probable cause to issue the warrant. The Fourth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, and Article I, § 8 of the North Dakota Constitution require searches and seizures to be reasonable and warrants to be issued only upon a showing of probable cause. The existence of probable cause is a question of law. *State v. Rangeloff*, 1998 ND 135, ¶ 16, 580 N.W.2d 593. "Probable cause to search exists 'if the facts and circumstances relied on by the magistrate would warrant a person of reasonable caution to believe the contraband or evidence sought probably will be found in the place to be searched.'" *State v. Thieling*, 2000 ND 106, ¶ 7, 611 N.W.2d 861 (quoting *State v. Johnson*, 531 N.W.2d 275, 278 (N.D.1995)).

[¶ 10]   The totality-of-the-circumstances test is used to determine whether sufficient evidence was presented to a magistrate to establish probable cause, independent of the trial court's findings. *State v. Damron*, 1998 ND 71, ¶ 7, 575 N.W.2d 912.

> "Although each bit of information ..., by itself, may not be enough to establish probable cause and some of the information may have an innocent explanation, ' "probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers ... which is not weighed in individual layers but in the 'laminated' total." ' "

*Id.* (citations omitted). The magistrate evaluates all the evidence and makes a practical, common sense decision whether probable cause exists to search a particular place. *Id.* at ¶ 6. We generally defer to a magistrate's determination of probable cause if there was a substantial basis for the conclusion, and doubtful or marginal cases should be resolved in favor of the magistrate's determination. *Id.*

### A.

[¶ 11]   There must be a nexus between the place to be searched and the contraband sought. *State v. Lewis*, 527 N.W.2d 658, 662 (N.D.1995). In this case, the contraband sought by the warrant was:

> Unlawful controlled substances including but not limited to marijuana, methamphetamine, drug paraphernalia, docu-

ments reasonably associated with drug trafficking, methamphetamine manufacturing, residency and U.S. currency reasonably associated with drug trafficking, electronic equipment used for storing recipes for manufacturing, equipment and ingredients commonly used for manufacturing and/or drug trafficking activity, which may constitute evidence of a criminal offense.

The affidavit stated GLJ439, which was being used by Paul Palmer, was located at 541 Valley Street and Dodson's trailer on the same day Dodson purchased sulfuric acid; burnt bindles and Equate Suphedrine were found in the garbage at 541 Valley Street; individuals charged with drug-related offenses were associated with 541 Valley Street; and Monte Olson stated he and the owner of 541 Valley Street distributed methamphetamine. This information does not establish a sufficient nexus between # 23 Parkview Trailer Court and the contraband sought.

[¶ 12] Circumstantial evidence may establish the nexus between a place to be searched and the contraband sought. *State v. Hage*, 1997 ND 175, ¶ 20, 568 N.W.2d 741. However, the fact GLJ439 was at 541 Valley Street and # 23 Parkview Trailer Court on the same day, which was prior to any evidence of drug activity being discovered at 541 Valley Street, does not provide a sufficient link between the two locations from which conduct occurring at 541 Valley Street can cast a degree of suspicion upon # 23 Parkview Trailer Court. *See State v. Mische*, 448 N.W.2d 415, 421 (N.D.1989) (finding that ample evidence the defendant was involved in criminal activity at one location was not enough to establish probable cause to search his residence). The evidence regarding 541 Valley Street would not lead a person of reasonable caution to believe the contraband sought would be located at

# 23 Parkview Trailer Court. *See id.* at 420 (citing *State v. Metzner*, 338 N.W.2d 799, 804 (N.D.1983)). Therefore, the evidence discovered during the garbage bag searches, the association evidence regarding Alisia Moncada and John Wilkins, Jr., and the information provided by Monte Olson, while creating suspicion of drug activity, do not together establish probable cause regarding # 23 Parkview Trailer Court. As a result, we consider whether the other evidence provided in the affidavit established probable cause to issue the search warrant for # 23 Parkview Trailer Court.

### B.

[¶ 13] The affidavit contained information that Palmer and Dodson went to Home of Economy, where Dodson purchased a 32–ounce container of Mr. Plumber, which can be used in the process of manufacturing methamphetamine. It stated Palmer was on probation in Williams County and suspected to be involved in methamphetamine labs in Williston. Officer Niebuhr also stated Dodson was known to be involved in the drug culture in Minot and numerous reports regarding him had been received, including a report from Shamra Campbell that Dodson "does more than his share of buying and selling methamphetamine."

[¶ 14] Dodson claims the information regarding his reputation is conclusory. "[S]tatements of reputation or unsupported conclusions and allegations are insufficient to establish probable cause" unless they are supported by "specific underlying circumstances." *State v. Ennen*, 496 N.W.2d 46, 50 (N.D.1993) (citing *State v. Handtmann*, 437 N.W.2d 830, 835 (N.D. 1989) and *State v. Erickson*, 496 N.W.2d 555, 558 (N.D.1993)). The statement regarding Dodson's reputation in this case is similar to the reputation information pre-

sented in *Ennen.* In *Ennen,* the officer stated in his affidavit, "Based upon my investigation of the Ray, North Dakota area, I have determined that Mr. Patrick Ennen is a known drug user." *Id.* at 48. This Court determined the statement could not be used to support probable cause because there was no evidentiary support for the statement. *Id.* at 50.

[¶ 15] The reports regarding Dodson and the statement by Shamra Campbell do not provide the necessary evidentiary basis in this case.

We have presumed the reliability of citizen informants and said their reliability should be evaluated from the nature of their report, their opportunity to observe the matters reported, and the extent to which it can be verified by independent investigation. Furthermore, observations of fellow law enforcement officers involved in a common investigation are also considered a reliable basis in a magistrate's probable cause determination. Despite this general rule of police officer reliability, "unnecessarily long chains of information passed through police channels" should be avoided, and an officer directly involved with the investigation and knowledgeable about the facts should be the affiant on the warrant application.

*Hage,* 1997 ND 175, ¶ 16, 568 N.W.2d 741 (citations omitted). In this case, there was no information provided from which the magistrate could determine Shamra Campbell's reliability or the nature of the intelligence reports. Therefore, the statements regarding Dodson's reputation, the intelligence reports, and the statement by Shamra Campbell do not raise a significant degree of suspicion regarding Dodson.

[¶ 16] Likewise, the information provided regarding Palmer is not enough to establish probable cause. In *Thieling,* we evaluated an affidavit which included infor-

mation from various officers that people suspected of being involved in the drug trade or who were associated with people involved in the drug trade visited the defendant's home. 2000 ND 106, ¶ 11, 611 N.W.2d 861. We stated, " '[M]ere suspicion that persons visiting the premises are connected with criminal activity will not suffice' for issuance of a warrant to search the premises." *Id.* at ¶ 12 (quoting 2 Wayne R. LaFave, Search and Seizure § 3.7(d), at 374 (3d ed.1996)). This Court found the information regarding Thieling's associations in connection with the other minimal evidence of drug activity was at most a very thin layer in the probable cause analysis. *Id.* Similarly, in this case, the information regarding Palmer when considered with the other minimal evidence of drug activity occurring at # 23 Parkview Trailer Court, does not give rise to a significant degree of suspicion and is at most a "very thin layer to be measured in the probable cause analysis." *Id.*

C.

[¶ 17] Dodson argues the information regarding the purchase of Mr. Plumber and Naptha was not sufficient to establish probable cause because Naptha and Mr. Plumber are innocent items. The relevant inquiry is not whether conduct is innocent or guilty, but what degree of suspicion attaches to it. *Illinois v. Gates,* 462 U.S. 213, 245, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *State v. Guthmiller,* 2002 ND 116, ¶ 13, 646 N.W.2d 724. Mr. Plumber and Naptha have common legal uses. Each product can also be used in the process of manufacturing methamphetamine. The simultaneous purchase of innocent items can become suspicious under circumstances indicating the items will be used to manufacture drugs. *See State v. Ballweg,* 2003 ND 153, ¶ 21, 670 N.W.2d 490. However, Dodson purchased one 32–

ounce bottle of Mr. Plumber and a container of Naptha. The information provided regarding the purchases does not cause a great degree of suspicion because there is minimal other evidence of drug activity occurring. *See Lewis*, 527 N.W.2d at 662–63 (holding that buying indoor growing supplies and covering up windows in the winter was as consistent with growing marijuana as it was with attempting to grow other plants indoors); *see also Ballweg*, at ¶ 21.

### D.

[¶ 18]  The information provided to the magistrate in this case was sufficient to cause suspicion and warrant further investigation.  However, the combined layers did not establish probable cause to believe the contraband sought would be found in the places to be searched.  Therefore, there was no probable cause to issue the search warrant under the Fourth Amendment of the United States Constitution.

### III

[¶ 19]  Absent an exception, "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).  The trial court found the good faith exception to the exclusionary rule applied in this case.  Dodson argues the tenuous nature of the affidavit was not enough for an officer to objectively rely on it.

[¶ 20]  The good faith exception to the exclusionary rule under the Fourth Amendment of the United States Constitution was recognized by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).  The Court held exclusion of evidence is not the proper remedy when an officer has acted in good faith upon objec-

tively reasonable reliance that a warrant was properly issued by a neutral and detached magistrate.  *Id.* at 922, 104 S.Ct. 3405.  We have summarized four situations in which reliance cannot be objectively reasonable under *Leon* as:

(1) when the issuing magistrate was misled by false information intentionally or negligently given by the affiant; (2) when the magistrate totally abandoned her judicial role and failed to act in a neutral and detached manner; (3) when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when a reasonable law enforcement officer could not rely on a facially deficient warrant.

*State v. Herrick*, 1999 ND 1, ¶ 15, 588 N.W.2d 847 (citing *Leon*, at 923, 104 S.Ct. 3405).  The basis of the good faith exception is that if an officer reasonably relies on a warrant in good faith, there is no police misconduct to deter.  *Leon*, at 916, 104 S.Ct. 3405.  It is not used to deter misconduct of judges or magistrates.  *Id.*

[¶ 21]  Dodson has not sufficiently raised an argument that the North Dakota Constitution precludes application of the good faith exception to the state's exclusionary rule, notwithstanding its application under the federal constitution.  *See State v. Van Beek*, 1999 ND 53, ¶ 26 n. 4, 591 N.W.2d 112.  Previously, we have only applied the good faith exception in cases under N.D.C.C. § 19–03.1–32(3), which involves no-knock search warrants.  *Herrick*, at ¶ 27 ("we do not decide if in fact North Dakota does provide greater state constitutional protections than the Fourth Amendment, and if so, whether such heightened protection would preclude a good-faith exception to North Dakota's exclusionary rule").  So too, we do not decide whether we will adopt the good faith ex-

ception in this case where federal precedent controls because a state constitutional argument was not raised. *See State v. Hughes,* 1999 ND 24, ¶ 5, 589 N.W.2d 912 (concluding evidence was admissible under federal precedent regarding the good faith exception when the defendant did not sufficiently raise an argument that the "State Constitution affords greater protection than the Federal Constitution"); *State v. Garrett,* 1998 ND 173, ¶ 9 n. 1, 584 N.W.2d 502 (adhering to the position that the state and federal constitutions will be treated synonymously when no argument was raised based on the State Constitution); *State v. Johnson,* 531 N.W.2d 275, 280 (N.D.1995) (using the less restrictive federal test regarding the inevitable discovery doctrine when the state test required an additional element because only a federal constitutional issue had been raised and "we may not engraft our good-faith requirement onto federal Fourth Amendment law"); *see also State v. Thomas,* 540 N.W.2d 658, 666 (Iowa 1995) (noting the Iowa Supreme Court had not addressed the good faith exception in regards to the state constitution, but considering its effect on a violation of the Fourth and Fourteenth Amendments to the United States Constitution).

## A.

▓ [¶ 22] In *Arkansas v. Sullivan,* the United States Supreme Court held:

The Arkansas Supreme Court's alternative holding, that it may interpret the United States Constitution to provide greater protection than this Court's own federal constitutional precedents provide, is foreclosed by *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). There, we observed that the Oregon Supreme Court's statement that it could "'interpret the Fourth Amendment more restrictively than interpreted by the United States Supreme Court'"

was "not the law and surely must be inadvertent error." *Id.* at 719, n. 4, 95 S.Ct. 1215. We reiterated in *Hass* that while "a State is free as a matter of its own law to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards," it "may not impose such greater restrictions as a matter of federal constitutional law when this Court specifically refrains from imposing them." *Id.* at 719, 95 S.Ct. 1215.

532 U.S. 769, 772, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001). Therefore, we are required to apply the good faith exception to the exclusionary rule under the Fourth Amendment when evaluating a federal constitutional claim because, if we do not, we will be imposing greater restrictions on police activity when the United States Supreme Court specifically refrained from doing so in *Leon.*

[¶ 23] We are also required to apply the good faith exception to the exclusionary rule under the Fourth Amendment in the same manner as the federal courts apply it. The United States Supreme Court has expressed the importance of uniformity in federal law. *Michigan v. Long,* 463 U.S. 1032, 1040, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In *Long,* the Court held a search of a vehicle's passenger compartment was reasonable under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and other Supreme Court decisions. *Long* at 1035, 103 S.Ct. 3469. In reaching this holding, the Court had to determine whether the state court judgment appealed from rested on independent state grounds. The Court observed that state courts often have to apply federal constitutional standards and in doing so they create a "considerable body of 'federal law.'" *Id.* at 1042, 103 S.Ct. 3469. The Court found:

"It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions. But it is equally important that ambiguous or obscure adjudications by state courts do not stand as barriers to a determination by this Court of the validity under the federal constitution of state action."

*Id.* at 1041, 103 S.Ct. 3469 (quoting *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940)). *Long* requires the Court to accept that a state court decision is decided a certain way because the state court believes federal law so requires when the decision "fairly appears to rest primarily on federal law ... and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Id.* at 1040–41, 103 S.Ct. 3469.

[¶ 24] In an appeal from the Arizona Supreme Court, the United States Supreme Court applied the standard from *Long* in a case involving the good faith exception. *Arizona v. Evans*, 514 U.S. 1, 7–8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (responding to a contention that the Court lacked jurisdiction because the good faith issue was decided pursuant to an Arizona statute). In finding it had jurisdiction to review the case, the Court stated, "State courts, in appropriate cases, are not merely free to—they are bound to—interpret the United States Constitution. In doing so, they are not free from the final authority of this Court." *Id.* at 8–9. In response to the dissent's position that the state courts need to be able to serve as laboratories for novel legal issues, the Court found Arizona was now freer to do so because it no longer had an erroneous view of what the United States Constitution required. *Id.* at 8, 115 S.Ct. 1185. The Court determined the Arizona Supreme Court's decision was based on federal law because it did not offer a plain statement that state law was being applied and the Arizona court primarily cited *Leon* in its holding. *Id.* at 9–10.

[¶ 25] In *Evans*, the police had performed a search pursuant to an arrest warrant that had been quashed. *Id.* at 4, 115 S.Ct. 1185. However, the court personnel responsible for informing the police that the warrant was no longer valid did not do so. *Id.* at 5, 115 S.Ct. 1185. Officers arrested the defendant based on the warrant and performed a search of his automobile. *Id.* at 4–5, 115 S.Ct. 1185. The Arizona Supreme Court found the evidence should have been suppressed. It stated that it could not " 'support the distinction drawn ... between clerical errors committed by law enforcement personnel and similar mistakes by court employees,' and that 'even assuming ... that responsibility for the error rested with the justice court, it does not follow that the exclusionary rule should be inapplicable to these facts.' " *Id.* at 14, 115 S.Ct. 1185 (quoting *State v. Evans*, 177 Ariz. 201, 866 P.2d 869, 871 (1994)). Relying on the framework from *Leon*, the Court reversed. The Court determined the holding was contrary to its decisions applying the good faith exception because it would not deter police misconduct and there was no reason to believe there would be a substantial effect on the court employees responsible for the error. *Id.* at 14–15, 115 S.Ct. 1185.

[¶ 26] Although the facts of *Evans* are not particularly analogous to this case, the application of the good faith exception to the Arizona court's judgment illustrates that state courts are to apply the good faith exception to the exclusionary rule under the Fourth Amendment in a manner that is consistent with United States Supreme Court precedent when evaluating a violation of the Fourth Amendment. Additionally, this Court and other state courts have stated federal precedent is

controlling when evaluating the good faith exception under the Fourth Amendment. *Hughes*, 1999 ND 24, ¶ 5, 589 N.W.2d 912 ("Federal precedent controls" when the defendant does not properly raise a state constitutional issue); *see also Thomas*, 540 N.W.2d at 666 ("In assessing Fourth Amendment violations, this court is bound by federal law"); *State v. Saiz*, 427 N.W.2d 825, 828 (S.D.1988) ("the Fourth Amendment question in this case is controlled by *Leon*").

### B.

[¶ 27] There is a strong preference for officers to obtain search warrants. *See Leon*, 468 U.S. at 913–14, 104 S.Ct. 3405.

Because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)), we have expressed a strong preference for warrants and declared that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fail." *United States v. Ventresca*, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

*Leon* at 913–14, 104 S.Ct. 3405. In this case, we have determined the information provided in the affidavit did not rise to the level of establishing probable cause for the magistrate to issue the search warrant. However, the information when taken in its entirety was not so lacking in indicia of probable cause that Officer Niebuhr could not reasonably rely on the judgment of the issuing magistrate. *See United States v. Carpenter*, 341 F.3d 666, 671 (8th Cir.2003) ("It is sufficient to note that [the defendant] raises a close question concerning a legal deficiency. On such issues, officers may reasonably rely on the judgment of the issuing magistrate"). In this case, Officer Niebuhr sought approval of a search warrant from a neutral and detached magistrate. Relying on that magistrate's determination that the warrant established probable cause was not objectively unreasonable. Therefore, the evidence was properly admitted under *Leon* because there was no police misconduct to deter.

[¶ 28] For the reasons stated herein, the judgments of the trial court are affirmed.

[¶ 29] CAROL RONNING KAPSNER, MARY MUEHLEN MARING, and WILLIAM A. NEUMANN, JJ., concur.

SANDSTROM, Justice, concurring specially.

[¶ 30] Although this Court may, in an appropriate case, interpret a provision of our State Constitution differently than the United States Supreme Court has interpreted a parallel provision of the United States Constitution, this Court's interpretation must be based on the history of the document, not the individual philosophy or views of the justices. As Justice Vande-Walle wrote in his special concurrence in *State v. Ringquist*, 433 N.W.2d 207, 217 (N.D.1988):

Although I agree we need not merely echo the United States Supreme Court in applying our own constitutional provisions which are identical to the Federal Constitution, I cannot agree that the interpretation and application of those provisions should merely reflect the philosophy or views of the particular justices who happen to be sitting at the time the issue of the application and

interpretation of our State Constitution is raised.

[¶ 31] The proceedings of the North Dakota Constitutional Convention offer no support for the contention that the drafters of our State Constitution intended greater protections for criminal defendants than those provided by the United States Constitution, except to extend those protections to state court proceedings. As I explained in my concurrence in *State v. Herrick*, 1999 ND 1, ¶¶ 33–36, 588 N.W.2d 847:

> "The framers of North Dakota's Constitution must have intended more protection under the North Dakota Constitution's unreasonable searches and seizures clause than that of the Fourth Amendment to the United States Constitution, because otherwise the state provision is a meaningless redundancy." So goes the argument. What the argument lacks is historical perspective.
>
> From its adoption, the Fourth Amendment of the United States Constitution was considered a limitation only on the federal government. It was not until 1961 that the United States Supreme Court, in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), extended "the Fourth Amendment rights to be free from unreasonable searches and seizures and to have excluded from criminal trials any evidence illegally seized" to the states. *Duncan v. Louisiana*, 391 U.S. 145, 148 and n. 6, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).
>
> When the framers of North Dakota's Constitution included an unreasonable searches and seizures clause, they were prohibiting the state from doing what the federal government was prohibited from doing. In view of then current federal constitutional jurisprudence, our

framers were providing a real protection that would otherwise have been lacking.

> A review of the entire proceedings of our State Constitutional Convention offers not one word of support for the concept that the framers intended to do anything other than prohibit the state from doing what the federal government was prohibited from doing. Official Report of the Proceedings and Debates of the First Constitutional Convention of North Dakota (1889); Journal of the Constitutional Convention for North Dakota (1889).

[¶ 32] This Court recently unanimously reaffirmed that we look to historical context in interpreting the meaning of guarantees in our State Constitution. *See, e.g., State v. $17,515.00 in Cash Money*, 2003 ND 168, ¶ 6, 670 N.W.2d 826 (citations omitted):

> N.D. Const. art. I, § 13 . . . provides: "The right of trial by jury shall be secured to all, and remain inviolate." This provision neither enlarges nor restricts the right to a jury trial, but merely preserves the right as it existed at the time of the adoption of our constitution.

[¶ 33] Relating to search and seizure, Justice VandeWalle noted in his *Ringquist* special concurrence:

> [T]he language of our State Constitution, Article I, Section 8, does not significantly differ from the Fourth Amendment language of the United States Constitution. It seems enigmatic to, on the one hand, observe that the history of our State Constitution reveals an intention to make its provisions of basic rights broader than those in the Federal Constitution and, on the other hand, recognize that prior to *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), evidence obtained through a search and seizure without legal justifi-

cation was admissible if it tended to prove that the defendant committed an offense. *State v. Lacy,* 55 N.D. 83, 212 N.W. 442 (1927).

*Ringquist,* 433 N.W.2d at 217.

[¶ 34]  In the final analysis, we must remember that we who at this time hold these positions of responsibility are not the law, but servants of the law.

[¶ 35]   Dale V. Sandstrom